UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Robert Kelly, Eryn Learned, and Kerry Wano, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>The McClatchy Company, LLC, a Delaware Corporation,<br><br>Defendants. | No. 2:21-cv-01960-KJM-JDP<br><br>ORDER |

Defendant moves to compel arbitration of plaintiffs' claims under the Telephone Consumer Protection Act (TCPA). The parties' arbitration agreement does not cover the dispute in question, as explained below. The court **denies the motion**.

## I.   FACTUAL ALLEGATIONS

Plaintiffs Robert Kelly, Eryn Learned and Kerry Wano bring this proposed class action under the TCPA, 47 U.S.C. § 227. Compl. at 1, ECF No. 1. Defendant McClatchy is a publishing company, which operates twenty-nine local newspapers in fourteen states. *Id*. ¶ 22.[1]
Each plaintiff and potential class member purchased a subscription to a McClatchy publication.

---

[1] McClatchy is owned by SIJ Intermediate, LLC. Corporate Disclosure, ECF No. 11.

1

*Id.* ¶¶ 42, 54, 69. Every individual who subscribes to a McClatchy newspaper must agree to be bound by the company's Terms of Service. Ravera Decl. ¶ 3, ECF No. 30-2. The "Terms of Service are identical for each newspaper, except for the information specific to the newspaper." *Id.*[2] Each agreement's provisions allow a subscriber to "terminate these Terms of Service or [the subscriber's] account by: (a) discontinuing . . . use . . . and (b) destroying and removing all copies of Content . . . in [the subscriber's] possession and control." Terms of Service, Ravera Decl. Exs. 9–11, ECF Nos. 30-11, 30-12 & 30-13.[3] The Terms of Service also include a "Dispute Resolution and Arbitration" provision, which provides that the subscriber and McClatchy "agree that any Subject Legal Claim that either [party] may have must be resolved through binding individual arbitration before the American Arbitration Association using its Consumer Arbitration Rules." Terms of Service at 12–13. The agreement makes two exceptions for individual actions in small claims court and enforcement of patents, trademarks, copyrights or trade secrets. *Id.*

      The Terms of Service incorporate a Privacy Policy by reference, *id.* at 1, which acknowledges that McClatchy collects phone numbers and other contact information when a person registers for a McClatchy service. McClatchy Privacy Policies at 4, Ravera Decl. Ex. 12, ECF No. 30-14. In the section discussing what McClatchy does with the information it collects, the Privacy Policy notes "[f]irst and foremost, [McClatchy] use[s] [the subscriber's] information to help [subscribers] use and navigate McClatchy Services." *Id.* at 8. As examples of this use, the agreement lists:

- Making a McClatchy Service available to you;
- Providing you with products;
- Creating access to your account;
- Responding to your requests, questions, suggestions, or complaints;

---

[2] "Although the Terms of Service have been amended from time to time since 2015, the arbitration provision at Paragraph 10.3 has not been amended." Ravera Decl. ¶ 15.

[3] As there are no meaningful differences between and among the agreements for different newspapers, the court adopts "Terms of Service" as a short-hand citation for the terms of all of the McClatchy publications. *See The Olympian* Terms of Service at 11, Ravera Decl. Ex. 9, ECF No. 30-11; *The Idaho Statesman* Terms of Service at 12, Ravera Decl. Ex. 10, ECF No. 30-12; *The Kansas City Star* Terms of Service at 12, Ravera Decl. Ex. 11, ECF No. 30-13.

- Resolving disputes;
- Completing your payments and transactions;
- Sending service-related messages (e.g., a change in our terms and conditions);
- Letting you take part in paid services, polls, promotions, surveys, panels, research, and comments;
- Improving, maintain [sic], and troubleshooting our services.

*Id.* at 8–9. Nowhere does the Privacy Policy or Terms of Service document mention the defendant's right to use information it gathered while an individual was subscribed to later solicit renewal of a subscription after the Terms of Service have ceased to apply by virtue of a customer's cancellation of a subscription. The Privacy Policy also provides that individuals "can ask [defendant] to unsubscribe from our mail or telephone solicitations." *Id.* at 16.

Plaintiffs here eventually canceled their respective subscriptions, Compl. ¶¶ 43, 55, 71, and then began receiving unwanted calls from McClatchy soliciting a renewal, *id.* ¶¶ 45, 58–59, 72. They each told defendant to stop calling, but the calls continued. *See, e.g.*, *id.* ¶ 3. They then filed this case in the Western District of Washington, bringing two claims against McClatchy for two violations of the TCPA: making telemarketing calls to individuals listed on the National Do Not Call Registry without written consent and continuing calls despite receiving "do not call" requests. *See generally* Compl. The Washington district court transferred the case to this district. ECF No. 27.

As noted, defendant moves to compel arbitration. Mot., ECF No. 30. The plaintiffs oppose. Response, ECF No. 41. Defendant replied. Reply, ECF No. 44. The court submitted the matter without oral argument. Min. Order, ECF No. 45.

**II.     LEGAL STANDARD**

"[T]he Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, governs arbitration agreements in contracts involving interstate commerce." *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1058 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2856 (2021). "Generally, in deciding whether to compel arbitration, a court must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute."

3

*Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). The party moving to compel arbitration bears the burden of showing each of these elements by a preponderance of the evidence. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). "A court may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (quoting *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

### III. ANALYSIS

The parties do not dispute that they entered into an arbitration agreement. *See* Response at 1–2; Reply at 2–3. The plaintiffs contend, however, that the arbitration agreement terminated with the cancellation of their subscriptions. *See* Response at 4–8. They also argue their claims fall outside the scope of the arbitration clause, *see id.* at 8–10, and that they did not agree an arbitrator would resolve their current disputes, *see id.* at 10–12.

"Whether a party has agreed to arbitrate disputes following contract termination depends upon whether the arbitration obligations created under that contract remain enforceable." *Shivkov*, 974 F.3d at 1060. "Although the Supreme Court has not addressed the issue of post-termination arbitration of disputes in the FAA context, the Court has addressed this issue in the collective bargaining context," and the Ninth Circuit has adopted the Court's reasoning in resolving FAA disputes. *See id.* at 1060–61 (citing *Litton Financial Printing Div. v. N.L.R.B.*, 501 U.S. 190 (1991)). *Litton* recognized a "presumption in favor of postexpiration arbitration of matters unless 'negated expressly or by clear implication' [for] matters and disputes arising out of the relation governed by contract." 501 U.S. at 204. This presumption applies if the parties' dispute has "its real source in the contract." *Id.* at 205. A "postexpiration" claim has its real source in a contract in three circumstances: (1) "where it involves facts and occurrences that arose before expiration," (2) "where an action taken after expiration infringes a right that accrued or vested under the agreement," and (3) "where, under normal principles of contract interpretation,
/////

the disputed contractual right survives expiration of the remainder of the agreement." *Id.* at 205–06.

Here, the plaintiffs' claims do not have their "real source" in the Terms of Service under the *Litton* test. First, the plaintiffs' disputes concern only the calls they received after their subscription contracts expired. The defendant argues that because plaintiffs provided their consent to be contacted upon entering into their subscriptions, their claims are grounded in the circumstances surrounding that consent, effected before plaintiff's terminated their contracts. However, the Ninth Circuit has "determined that express consent [is] 'not an element of a plaintiff's prima facie case' but [] "an affirmative defense. . . ." *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 498 (9th Cir. 2019); *see, e.g.*, *Stevens-Bratton v. TruGreen, Inc.*, 675 Fed. App'x 563, 568–69 (6th Cir. 2017) (reversing district court's decision to compel arbitration on TCPA claims because of the "more than ten phone calls [plaintiff] received after the agreement expired"). Second, the plaintiffs' claims did not accrue or vest under the Terms of Service; they accrued after the Terms of Service expired, and arise under federal law. Thus the court focuses on the third option, whether under normal principles of contract interpretation the rights in question do not survive expiration.

This latter analysis presents the closest question. The court must determine whether or not "the parties [ ] intend[ed] for the arbitration clause to survive expiration of the contract." *Shivkov*, 974 F.3d at 1063. Defendant argues a presumption in favor of arbitration exists because its use of the plaintiffs' phone numbers "to encourage them to renew their subscriptions is not outside of the scope of the arbitration provision." Reply at 6. Defendant relies heavily on several opinions from district court decisions from within the Ninth Circuit to support its position that the plaintiffs consented to be contacted. *Id* at 7 n.5. But the cases it cites are easily distinguishable. In *Hartranft v. Encore Capital Group.*, the court compelled arbitration where the agreement covered "any claim, dispute or controversy . . . arising out of or related to . . . a previous related Account," 543 F. Supp. 3d 893, 905 (S.D. Cal. 2021), and the calls that served as the basis for the TCPA claim were attempts "to collect [the plaintiff's] unpaid" fees, *id.* at 910. Similarly, in *Cayanan v. Citi Holdings*, "all of the calls made to [p]laintiffs concerned the accounts they had

1  already opened with [d]efendants and [p]laintiffs' ongoing responsibility to make payments on
2  those accounts." 928 F. Supp. 2d 1182, 1208 (S.D. Cal. 2013). Here, in contrast, the defendant
3  did not continually call plaintiffs to enforce a provision of the agreement plaintiffs failed to meet
4  prior to termination. *Litton*, 501 U.S. at 206 ("an expired contract has by its own terms released
5  all its parties from their respective contractual obligations, except obligations already fixed under
6  the contract but as yet unsatisfied").

7  Other cases cited by defendant also are distinguishable by the fact that postexpiration
8  enforcement of an arbitration agreement was not at issue. *See Thomas v. Wells Fargo Dealer*
9  *Servs.*, No. 13-5168, 2013 WL 12114768, at *2 (C.D. Cal. Oct. 1, 2013) ("[p]laintiff claim[ed]
10 that the Arbitration Clause was not part of the [agreement], her claims under the TCPA . . . do not
11 fall within [the] scope [of the agreement, and] no arbitration agreement is enforceable under
12 federal or California law."). The Ninth Circuit has held that providing contact information for the
13 purposes of obtaining a membership or subscription, as the plaintiffs did here, can constitute
14 "prior express consent" to be contacted under the TCPA. *Van Patten v. Vertical Fitness Grp.*,
15 LLC, 847 F.3d 1037, 1046 (9th Cir. 2017). The Circuit also explains that consent may be
16 revoked, but "[r]evocation of consent must be clearly made and express a desire not to be called
17 or texted" and the plaintiff in *Van Patten* had not met that standard. *Id.* at 1048. After canceling
18 his membership, Van Patten received text messages to rejoin his gym. *Id.* at 1041. The Ninth
19 Circuit found Van Patten's providing his number to the gym in order to sign up amounted to his
20 consent to receive messages inviting him to reactivate his membership after he canceled it. *Id.* at
21 1046. Unlike the plaintiffs in this case, "Van Patten did not clearly express his desire not to
22 receive further [ ] messages" *Id.* at 1048 ("No evidence in the record suggests that Van Patten
23 told Defendants to cease contacting him on his cell phone."). Unlike in *Van Patten* the complaint
24 here shows the plaintiffs repeatedly and explicitly asked defendant to stop contacting them.
25 Compl. ¶¶ 47–48, 62–64, 74, 80–82. *Van Patten* does not dictate that plaintiffs' consent upon
26 first entering into their subscriptions mandates arbitration after they cancelled those subscriptions.

27 The plaintiffs rely on the First Circuit's decision in *Breda v. Cellco Partnership*.
28 Response at 6. In *Breda*, after switching from a Verizon Wireless phone plan to one operated by

6

Republic Wireless, "Breda began receiving automated calls from" Verizon, which continued despite Breda's repeatedly asking Verizon representatives to stop the calls. 934 F.3d 1, 6 (1st Cir. 2019). The First Circuit concluded that TCPA claims, by their very nature, do not involve rights "accrued or vested" under a private agreement between the parties. *Id.* at 6–8 ("Nor do Breda's statutory TCPA claims involve a contractual right or a right that accrued or vested under the Agreement"); *Rahmany v. T-Mobile USA Inc.*, 717 F. App'x 752, 753 (9th Cir. 2018) (unpublished) ("The TCPA, not the Wireless Agreement, creates and defines any alleged duty to refrain from sending an unwanted text message."). Thus, the parties' dispute did not concern a right that "survive[d] expiration of the remainder of the agreement," as the plaintiffs' "TCPA claims [were] entirely unrelated to the parties' prior relationship." *See Breda*, 934 F.3d at 6–8. Similarly, the Terms and Conditions and Privacy Policy in this case provide that the plaintiffs agreed to give defendant their contact information, but there is no language supporting defendant's right to continue contact indefinitely after termination, including with repeated "do not call" requests.

The arbitration agreement does not cover the dispute at issue here. *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020) (the court's role is "limited to determining (1) whether a valid agreement to arbitrate exists[,] and if it does, (2) whether the agreement encompasses the dispute at issue").

### IV. CONCLUSION

The court **denies the motion to compel arbitration (ECF No. 30).**

IT IS SO ORDERED.

DATED: May 25, 2022.

CHIEF UNITED STATES DISTRICT JUDGE